Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant WALTER DAWYDIAK

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>vs.<br><br>WALTER DAWYDIAK,<br><br>Defendant. | Case No. 22-cr-00457 SI<br><br>**DEFENDANT WALTER DAWYDIAK'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE PURSUANT TO 18 U.S.C. § 2335(A)**<br><br>Crt.: Hon. Susan Illston<br>Sentencing hearing: August 18, 2023 at 11:00 a.m. |

///

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

II. THE PLEA AGREEMENT AND THE PRESENTENCE REPORT ............................. 1

   A. The Plea Agreement. ...................................................................................................... 1

   B. The Presentence Report. ................................................................................................ 1

III. SENTENCING RECOMMENDATION ........................................................................... 3

   A. The Offense Conduct and the History and Characteristics of Mr. Dawydiak Justify the Recommended Sentence. ............................................................................. 3

      1. The offense conduct. ............................................................................................... 3

      2. The history and characteristics of the defendant. .............................................. 4

        i. Mr. Dawydiak's extraordinary acceptance of responsibility and his efforts to right his wrongs. ............................................................................................ 4

        ii. Mr. Dawydiak's background. ............................................................................ 5

   B. A Sentence of Six Months of Custody and Six Months of Home Confinement is Sufficient but not Greater Than Necessary to Achieve the Goals of Sentencing ....... 11

   C. Recent Amendments to the Sentencing Guidelines and the Lack of Empirical Evidence Supporting the Loss Enhancements of the Fraud Guidelines Support the Jointly Recommended Sentence ................................................................................... 13

IV. CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*United States v. Abbouchi*, 502 F.3d 850 (9th Cir. 2007) ................................................................ 2

*United States v. Sales*, 476 F.3d 732 (9th Cir. 2007) ...................................................................... 2

**FEDERAL STATUTES**

18 U.S.C. § 3553(a) ..................................................................................................................... 1, 3

18 U.S.C. § 3563(b) ......................................................................................................................... 2

8 U.S.C. § 3563(a) ........................................................................................................................... 3

**OTHER AUTHORITIES**

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ............. 13

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ............................. 13

## I. INTRODUCTION

Walter Dawydiak acknowledges that he lied to customers who trusted him to sell their vehicles on consignment and that, as a result, many customers were defrauded. He also evaded his obligation to pay his full share of taxes. His crimes justify a custodial sentence, and the parties have agreed to one. However, the government and the defense agree that Mr. Dawydiak's acceptance of responsibility has been extraordinary. He acknowledged his wrong-doing long before charges were filed, he fully cooperated with the government's efforts to identify the victims of his actions, and he has set aside funds sufficient to make full restitution immediately following sentencing. While the Sentencing Guidelines recommend a higher sentencing range, the parties submit that a variance to six months' custody followed by six months' home confinement is appropriate. The Probation Office joins in this recommendation.

## II. THE PLEA AGREEMENT AND THE PRESENTENCE REPORT

### A. The Plea Agreement.

The parties entered into a Rule 11(c)(1)(B) plea agreement in which they agreed to recommend a custodial sentence of six months to be followed by a six-month period of home confinement during supervision. Dkt. 10 (plea agreement), ¶ 8. The plea agreement states that the below-Guidelines recommendation is based on, among other things, Mr. Dawydiak's "cooperation regarding the facts and scope of his criminal conduct, including his cooperation in calculating loss and restitution amounts [and] his efforts to make restitution to his victims."." *Id*. at ¶ 15.

### B. The Presentence Report.

Mr. Dawydiak has no objection to the factual recitations in the Presentence Report ("PSR"). Mr. Dawydiak also agrees with the Probation Office's Sentencing Guidelines calculations. PSR at ¶¶ 15-44. The advisory Guidelines range is 33 to 41 months. *Id*. at ¶ 78.

Mr. Dawydiak also agrees with the Probation Office's recommendation of a six-month sentence, which results from a downward variance under 18 U.S.C. § 3553(a). Sent. Recommendation at 1.

Mr. Dawydiak objects to two special conditions of supervision proposed by the Probation Office and one standard condition.

Counsel objects to special conditions three and four as not reasonably related to the sentencing factors as required by 18 U.S.C. § 3563(b) and not supported by the record of the offense in this case. Therefore, they impose a deprivation of liberty greater than is reasonably necessary to achieve the goals of sentencing. *United States v. Sales*, 476 F.3d 732, 735-37 (9th Cir. 2007) (vacating conditions of supervised release where record failed to suggest a link between the offense and the conditions of release); *United States v. Abbouchi*, 502 F.3d 850, 858 (9th Cir. 2007) ("The justification for imposition of a non-standard probation condition must be supported by the record.")

Special condition numbers three (defendant cannot open new lines of credit without Probation's permission) and four (defendant shall give probation officer access to his financial information) impose restrictions on Mr. Dawydiak's ability to conduct his financial affairs. These conditions are appropriate where the defendant has outstanding restitution or fine obligations. *See* U.S.S.G. § 5D1.3(d)(2) (recommending "a condition prohibiting the defendant from incurring new credit charges or opening additional lines of credit" where "payment of restitution or a fine is imposed"); U.S.S.G. § 5D1.3(d)(3) (recommending "a condition requiring the defendant to provide the probation officer access to any requested financial information" where "the court imposes an order of restitution, forfeiture, or notice to victims, or orders the defendant to pay a fine"). Mr. Dawydiak has taken proactive steps to make payment in full on his restitution obligation immediately following sentencing. Without an outstanding restitution obligation, there is no justification for imposing special conditions three and four. And while the Probation Office notes that special condition number four will also "ensure the defendant's future income is from legitimate sources," there is no question that the defendant's future income will derive from the automobile repair and sales businesses he owns (PSR, ¶¶ 67-74), and there is no allegation that those businesses and the resulting income are illegitimate.

Counsel also objects to the Probation Office's recommendation that Mr. Dawydiak submit to drug testing – once within 15 days of release from custody and two periodic tests thereafter. PSR, ¶ 79. Given that Mr. Dawydiak has no recent history of substance abuse (*id*. at ¶ 65), counsel requests that this condition be removed as unnecessary. *See* 18 U.S.C. § 3563(a)(4) (court may suspend standard drug testing condition "for any individual defendant if the defendant's presentence report or other reliable sentencing information indicates a low risk of future substance abuse by the defendant").

## III. SENTENCING RECOMMENDATION

As discussed below, the 18 U.S.C. § 3553(a) factors – particularly the history and characteristics of Mr. Dawydiak, Mr. Dawydiak's extraordinary acceptance of responsibility, and his efforts to make restitution to his victims – support a downward variance and a sentence of six months of imprisonment and six months of home confinement.

### A. The Offense Conduct and the History and Characteristics of Mr. Dawydiak Justify the Recommended Sentence.

#### 1. The offense conduct.

The plea agreement and PSR accurately summarize Mr. Dawydiak's offense conduct. Dkt. 10, ¶ 2; PSR, ¶¶ 5-11. Mr. Dawydiak lied to his customers about the sale price of their cars and lied to the IRS about how much he had paid his employees. These are serious offenses deserving of punishment, but they should be placed in the context of Mr. Dawydiak's motivation for the scheme and his larger business practices.

Mr. Dawydiak has explained that the fraud began when he was unable to admit to his clients how much the repair work would cost in order to make the cars the customers were consigning attractive to buyers. Mr. Dawydiak should have had the tough conversations with customers about the necessary repairs and costs. Instead, he chose to do the work without the customers' consent. He then made up for the cost of that work by lying about the sales price so that he could recoup his expensive repair costs without the client knowing. This strategy of conflict avoidance became a habit, and over time, Mr. Dawydiak did not just cover the costs of

repairs by misleading clients about the sales prices of their cars, but he used it to keep more profit than he was entitled to.  Mr. Dawydiak offers no excuse for his conduct.  Instead, as he explained in his letter to the Court, "[f]or years I told myself that dishonesty was just part of the business I worked in[.]"  Declaration of Britt Evangelist In Support of Defendant's Sentencing Memorandum ("Evangelist Decl."), **Exhibit A**.

      Despite engaging in this fraudulent conduct, Mr. Dawydiak operated an otherwise successful and legitimate business for decades.  He currently employees approximately 20 people, several of whom have written letters to the Court.  As Mr. Dawydiak explains in his letter to the Court, the government's investigation and the charges in this case were an "enormous and terrifying wakeup call[.]"  *Id*.  As a result, Mr. Dawydiak reformed his business practices – hiring an experienced controller and revamping his consignment sales business (PSR, ¶ 71) – and is "proud to say that today I operate my company in full compliance with the law and that I now truly hold myself and my business practices to high ethical standards."  Evangelist Decl., **Exhibit A**.  While Mr. Dawydiak's incarceration will present challenges to his business given how integral he is to its operation (*id*. at ¶ 73), if it survives his absence, the Court can expect it will continue to operate lawfully and at a profit to the benefit of his employees and customers.

      2.    <u>The history and characteristics of the defendant.</u>

          i.    *Mr. Dawydiak's extraordinary acceptance of responsibility and his efforts to right his wrongs.*

Mr. Dawydiak cooperated with the government's investigation long before the government publicly charged this case in December 2022.  He first became aware of the investigation in September 2019.  He retained undersigned counsel and instructed us to contact the government and open discussions with the prosecuting attorney.  After producing documents and engaging in conversations with the government to learn the focus of their investigation, Mr. Dawydiak authorized undersigned counsel to hire a forensic accountant to conduct an independent review of his business records and accounting practices.

In May 2020, at Mr. Dawydiak's instruction, the accountant presented his findings on the fraud loss to AUSA Kingsley and the investigating agents. Mr. Dawydiak's cooperation with the government continued through 2022 and included, at Mr. Dawydiak's expense, (1) forensic review of company files to produce documents and information substantiating the loss calculation, and (2) forensic review of his company files (with the assistance of Mr. Dawydiak's company controller) to identify victims, locate victim contact information, and calculate restitution figures. When Mr. Dawydiak entered his guilty plea in February 2023, he did so without requiring the government to produce discovery, *Brady*, or *Giglio* material.

Mr. Dawydiak has also deposited nearly $540,000 into undersigned counsel's trust account, all of which will be used to make full and final payment on the restitution judgement once entered by the Court. Mr. Dawydiak secured these funds by taking a high-interest loan against property he owns.

This level of acceptance and proactive cooperation is highly unusual. Undersigned counsel expects that government counsel will concur in this assessment and express to the Court that Mr. Dawydiak's willingness to hire a forensic accountant to investigate the extent and amount of his fraud, to engage in early plea discussions, and to assist the government in identifying and locating fraud victims saved substantial prosecutorial resources.

> ii.   Mr. Dawydiak's background.

As the Probation Officer notes, Mr. Dawydiak "experienced a relatively stable upbringing." Sent. Recommendation at 2. He was born and raised in San Francisco by parents he describes as "warm and generous souls." PSR, ¶ 52. He did not experience acute poverty or parental abandonment. His childhood and young adulthood, however, were not without significant challenges. Mr. Dawydiak's lifelong struggle with ADHD began at a young age and became pronounced by adolescence. *Id*. at ¶¶ 52-54. Despite seeing a therapist and taking medication, by eighth grade the learning and behavior problems caused by his ADHD created problems in his life. *Id*. He began to fail in school. The schools gave up on Mr. Dawydiak and "passed" him from one grade to the next without requiring that he meet academic standards and

he became the subject of bullying and taunts. PSR, ¶¶ 54-55. Shortly thereafter he dropped out of high school. *Id*. at ¶¶ 55, 66. Meanwhile, Mr. Dawydiak's home life suffered as his behavioral issues "would occasionally drive my parents to a breaking point." *Id*. at ¶ 54. When yelling did not correct Mr. Dawydiak's behavior, his parents used household objects, such as wooden spoons and electrical cords, to discipline him. *Id*. He also began to believe that his behavior strained his parents otherwise happy marriage. *Id*. Mr. Dawydiak's troubled adolescence culminated in his stealing cars at age 17. *Id*. at ¶¶ 40-41, 55.

By his early 20s, Mr. Dawydiak did not have a promising future – a convicted car-thief with no high school education and no marketable skills. Mr. Dawydiak could have easily continued down the wrong path he had set for himself. But he did not let that happen.

Professionally, he set about building a business from the ground up. In 1981 he opened in a taxi stall the first iteration of what would later become Cars Dawydiak. Through long hours, trial and error, and rigorous self-education, Mr. Dawydiak taught himself the trades of auto detailing, auto bodywork, and auto mechanic. In 1988, with a loan from a family member, Mr. Dawydiak opened his first showroom in San Francisco – repairing, detailing, and selling cars under the Cars Dawydiak name. Today, Mr. Dawydiak employs approximately 20 individuals in his showroom and body shop, many of whom have worked with him for decades, and he is the go-to repair shop for local Jaguar, Landrover, and Bentley dealerships. *Id*. at ¶¶ 68-72.

Personally, Mr. Dawydiak also got his life back on track. He developed techniques to cope with his ADHD. *Id*. at ¶69. He reconciled with his parents, becoming their caregiver and provider as they aged and until their passing. *Id*. at ¶ 59. He married "the love of his life," Valerie, and together they raised Bianca Dawydiak, Mr. Dawydiak's daughter from a prior relationship who now works for an accounting firm in San Francisco, and are in the process of raising Ruby Dawydiak, their youngest daughter who, like Mr. Dawydiak, suffers from ADHD. *Id*. at ¶¶ 56-60.

The letters submitted to counsel and provided to the Court as **Exhibit B** to the Evangelist Declaration provide insight into how Mr. Dawydiak accomplished this turnaround and what that meant for the people in his life. As Mr. Dawydiak's wife Valerie explains, "My initial attraction to Walter was [because of] his love of family, his work ethic, and his genuine desire to be a positive force in people's lives." Evangelist Decl., **Exhibit B** at 11. The dozen or more other letters submitted by Mr. Dawydiak's family, friends, and employees echo these qualities – an unflinching work ethic and generosity to a fault – as Mr. Dawydiak's defining characteristics.

Regarding his work ethic, Mr. Dawydiak's wife explains that "[s]ince I first met him, he has worked long hours, (often seven days a week) for years on end. He is the last to leave most days." *Id*. at 11. She observed her husband's devotion to his business from the outside, but those who have worked closely with Mr. Dawydiak over the years second her assessment. Mr. Dawydiak's eldest daughter, Bianca, who worked with him for years, explains that he "made sure I have all the good parts of him – his strong work ethic . . . He's taught me to put pride and effort into all I do." *Id*. at 7. Letters from other employees likewise describe Mr. Dawydiak's devotion to his business. *E.g.*, *id*. at 1 (employee of 19 years describing Mr. Dawydiak as a "Drill Sargeant"); *id*. at 24 (employee of over 25 years stating, "I would also like you to know that Mr. Dawydiak also runs a great business I am proud to work for. He is an extremely hard-working business owner and takes great pride in how our body shop operations are run.").

One might expect a hard-driving business owner such as Mr. Dawydiak to focus on the bottom line to the detriment of his employees' well-being, but the letters from Mr. Dawydiak's employees paint a very different picture. They speak of a generous man whose giving takes the form of financial largesse and a penchant for hiring and mentoring individuals other employers would shy away from. As one long-term employee, Mike Leddy, observes, Mr. Dawydiak gave "to his detriment,":

> At times it was a strain financially, but always he found a way to take care of his employees. His intent and motivation in all that he does is to be kind and generous to others, especially those close to him. He is a person who finds sharing what he

has with others far more meaningful than just having it.

Evangelist Decl., **Exhibit B** at 19.

In his letter, Matthew Vasquez, who has worked for Mr. Dawydiak on and off for 15 years, describes how working for and being mentored by Mr. Dawydiak helped him get and stay sober:

> I was a heavy drinker and cocaine user when I met Walter. I applied for a maintenance job at his company. I was trying to get sober by myself – I didn't want to go to AA or something like that. What I didn't realize then but now I know is that working for Walter helped me get through and be sober. A lot of people that work in his shops are talented people but who are a bit lost in life. People like me, who need a push. Walter is a ball of energy and everyone he gets around just feeds off that energy in a forward moving process. Anything he puts in front of him, he puts 100% focus on. That's what I needed to get and stay sober. He made me be on time, stick to a schedule to get work done, and he put trust in me and put me in charge of other people. And it wasn't just me. He created a hierarchy in the business of everyone supporting the people around you and mentoring each other. It was a very different experience working for him than for other bosses I have had. Working for Walter I had a purpose and that kept me sober for years.

*Id*. at 25.

Mr. Vasquez goes onto describe how after he left Mr. Dawydiak's employ and relapsed, he returned to work at Cars Dawydiak, "and he [Mr. Dawydiak] saved me again," going so far as to make up projects to keep Mr. Vasquez busy and allowing him to sleep on the floor of the office, because "I felt safest there." *Id*. Mr. Vasquez's story of being "saved" by Mr. Dawydiak through mentorship and honest work is not unique. In his letter to the Court, Mr. Vasquez recounts how Mr. Dawydiak once hired a young man and his girlfriend who were living out of their car and allowed them to park and live in the shop's basement. *Id*. at 26. The young man now has a career working on oil rigs in Texas. *Id*. Similarly, Mr. Dawydiak hired and mentored a plumber with a drinking problem and "stayed on him for 1.5 years to stay sober" – the plumber now has his own Roto-rooter van and owns a home in Yreka. *Id*. Most recently, Mr. Dawydiak hired a friend of Mr. Vasquez's who is also in recovery. *Id*. As Mr. Vasquez puts it, "Walter takes shots on people and sometimes they pay off." *Id*.

Likewise, the letter from Luis Fernando Arellano, who has worked for Mr. Dawydiak for over 20 years, describes how Mr. Dawydiak hired him at a time where "I found myself having to sell drugs on the street to make ends meet," and that "without [Mr. Dawydiak] giving me the opportunity, I would have probably gone back to my old ways." Evangelist Decl., **Exhibit B** at 2. Mr. Arellano explains not only how Mr. Dawydiak furthered his career – mentoring him into the position of autobody technician – but also how Mr. Dawydiak's generosity extended well beyond the professional realm when he helped Mr. Arellano expunge his criminal record by paying his legal fees. *Id*.; *see also id*. at 18 (letter from attorney James Lassart discussing same).

In her letter, Lani Arajuo, who has worked for Mr. Dawydiak for 19 years, writes about how he "took a chance on me" when he hired her as a receptionist with no experience and then provided mentoring in the form of "guidance, leadership and detailed training and instructions" that "brought me to my potential." *Id*. at 1. But again, Mr. Dawydiak went further, helping her pay for a new roof on her home and purchasing an electric car for her so that she could more easily commute to San Francisco from her East Bay home. *Id*.

The letter from Malissa Ocampo Sneed, an employee of Mr. Dawydiak's since 1997, likewise praises how he "invested in, taught, and guided me," concluding, "I wouldn't be where I am today in my life without him." *Id*. at 23. Mr. Dawydiak's generosity to Malissa included sending her on a cruise to Mexico, buying her a dog, leasing a vehicle for her that she uses for her commute, and paying for diabetes medication not covered by her insurance. *Id*.

Another employee, Sheridan Langland, shares that Mr. Dawydiak helped her during a difficult financial time and then recounts a recent event that illustrates how he goes above and beyond for his employees:

> Within the last year we lost a long-term employee, who passed away, not only was Walter the one who went looking for him when he did not show up for work and discovered him deceased, Walter paid for the funeral expenses for his family.

*Id*. at 17.

Outside of work, Mr. Dawydiak is a devoted and loving father, husband, family member and friend. *E.g.*, Evangelist Decl., **Exhibit B** at 11 (Valerie Dawydiak stating, "Walter is an exceptional father to our two daughters," and describing his daily involvement in their lives); *id*. at 5 ("His first loyalty is to his family. Walter's loyalty, love, and devotion cannot be questioned."); *id*. at 21 ("[H]e has always been a kind and compassionate person who would fight to the death for his family, friends and employees."); *id*. at 15 ("I found him to be a very dedicated husband and father and someone who repeatedly took on the responsibility of caring for others in need.").

And as with the letters from Mr. Dawydiak's employees, the letters from Mr. Dawydiak's friends and family are replete with accounts of Mr. Dawydiak's selflessness and generosity to those in need. Leanna Dawydiak, Mr. Dawydiak's older sister, describes how Mr. Dawydiak mentored her son when he had "became a problem child[.]" *Id*. at 10. Leanna recalls her brother teaching her son "how to be a hard worker" and notes her son credits Mr. Dawydiak for "much of his success" as an adult. *Id*. Likewise, Valerie Dawydiak recounts how her husband took in and mentored two of her relatives – her nephew after he dropped out of high school and been arrested in North Carolina and her brother who had lost his job in North Carolina and struggled with drug and alcohol addiction. *Id*. at 11. Valerie recalls when her nephew "came here and we re-enrolled him in school. Walter picked him up every day, brought him back to work and kept an eye on him while he did homework and chores." *Id*. Mr. Dawydiak also gave her brother "a job, helped him move to CA, and invited him to live with us." *Id*. at 12. Today, in large part due to Mr. Dawydiak's caring and generosity, Valerie's nephew attends college and plans to attend law school, while her brother works as a general contractor, has purchased a home, and is engaged. *Id*. at 11-12.

Finally, the PSR and many of the letters submitted to the Court describe Mr. Dawydiak's decision to raise Bianca Dawydiak as his biological daughter. As described in the PSR, Mr. Dawydiak's first wife, Kimberly, suffered from mental health and substance abuse issues that

caused them to separate for a time, during which she had an affair and became pregnant with Bianca. When the two reconciled, Mr. Dawydiak committed to raising Bianca as his own child, regardless of her paternity, and was listed as the father on Bianca's birth certificate. Later, when Kimberly took Bianca to Australia and informed Mr. Dawydiak they would not be returning to the United States, Mr. Dawydiak worked to be maintain a relationship with Bianca, but Kimberly would not allow it. PSR, ¶¶ 56-57. Despite being forcibly estranged from his daughter by Kimberly, Mr. Dawydiak always supported Bianca financially from afar, he paid for treatment programs for Kimberly, and after Kimberly committed suicide, Mr. Dawydiak took Bianca into his home with his new wife and young daughter and raised her as his own. *Id*. at ¶¶ 57, 60.

In her letter to the Court, Bianca Dawydiak reflects upon Mr. Dawydiak's commitment to be a father to her. Evangelist Decl., **Exhibit B** at 7. She writes, "everything that I am, who I've grown and aspire to be and am proud of is because of my Dad . . . I am so lucky Walter is my Dad, he did not have any obligation to fill that role, he is not my biological father." *Id*. Looking back on how Mr. Dawydiak welcomed her into his home after her mother's death, Bianca recalls that "Walter took me in and treated me like his daughter," "was an integral person in the times which I was most in need of care, support, and love," and concludes "[c]onsidering he had no responsibility to me, this shows the kind of man he is." *Id*. Mr. Dawydiak's willingness to support and raise Bianca did not go unnoticed by his friends and family. Letter after letter points to this act as indicative of the man the authors know Mr. Dawydiak to be. *See id*. at 13 (Alex Fisher remarking "I know [taking in and raising Bianca] was not easy but it was the right thing to do and he did it); *id*. at 15 (Thomas Griesel stating that raising Bianca "is not something the 'average' man would step up to do, but Walter did it."); *id*. at 22 (Scott Savin describing Mr. Dawydiak's legal battle to be reunited with Bianca).

  **B.**  **A Sentence of Six Months of Custody and Six Months of Home Confinement is Sufficient but not Greater Than Necessary to Achieve the Goals of Sentencing**

Mr. Dawydiak's crimes are serious, but a sentence of six months of custody followed by

11

**Defendant's Sentencing Memorandum**
*United States v. Dawydiak*, No. CR. 22-00457-SI

six months of home confinement is sufficient to provide just punishment and to deter Mr. Dawydiak and others from committing similar offenses.

The jointly recommended sentence will provide just punishment.  Mr. Dawydiak is 64 years old, and his only convictions date back to the 1970s and 1990s, the most serious of which he committed at 19 years of age and that resulted in a 30-day sentence.  PSR, ¶¶ 40-43.  Given that over 40 years have elapsed since Mr. Dawydiak last served a jail sentence of more than a few days, a six-month sentence will be significant.  In addition, while the Guidelines suggest that ordinarily the offense here may warrant a lengthier punishment, Mr. Dawydiak's extraordinary efforts to accept responsibility, cooperate with the government and make his victims whole justify a less punitive sentence.

A lengthier sentence is not necessary for public safety or to impress on Mr. Dawydiak the need to reform.  As evidenced by his lengthy and costly efforts to assist the government with their investigation, Mr. Dawydiak has been deterred before serving a single day of his sentence.  The letters submitted to the Court from Mr. Dawydiak's friends and family likewise reflect that he has been open and honest with them about his transgressions and exhibited remorse that one would expect from a man who learned his lesson.  *E.g.*, Evangelist Decl., **Exhibit B** at 6 ("As friends, we discussed these criminal charges.  I saw a man who is confronting the circumstances of his own creation with regret, contrition, humility, and acute self-awareness."); *id*. at 8 (Bianca Dawydiak explaining she's seen Mr. Dawydiak "grow and change over the years, even during this case; he's no longer afraid to admit when he's wrong or has made a mistake"); *id*. at 12 ("He has been very honest about what occurred, how regretful he is, and how he plans to be accountable going forward."); *id*. at 14 ("Walter has been open with me about his transgressions and how they came to be . . . I believe he is sincere when he speaks about his remorse and lessons learned from his transgressions.")

Finally, imposing the jointly recommended sentence will deter others in Mr. Dawydiak's position.  That recommendation imposes a prison sentence despite Mr. Dawydiak's unusual and

extraordinary efforts to accept responsibility and make his victims whole.  The certainty that incarceration will follow a crime such as Mr. Dawydiak's, regardless of a defendant's efforts to make amends, provides the desired deterrent effect, not the length of that incarceration.  *See* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity . . . there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("certainty and promptness of punishment are more powerful deterrents than severity . . .increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").  However, the sentence recommended by the parties and the Probation Office will also send a message to would-be defendants that if you promptly accept responsibility for your actions and cooperate fully in the government's investigation, your sentence will take those actions into account.

> C. **Recent Amendments to the Sentencing Guidelines and the Lack of Empirical Evidence Supporting the Loss Enhancements of the Fraud Guidelines Support the Jointly Recommended Sentence**

As stated above, Mr. Dawydiak has no objection to the advisory Guidelines range calculated in the PSR.  Mr. Dawydiak, however, notes that under the Sentencing Guidelines set to take effect on November 1, 2023, he would qualify as a "Zero-Point Offender" under a new Guideline, U.S.S.G. § 4C1.1.  Section 4C1.1 states that for defendants with zero criminal history points who meet certain criteria, the court should "decrease the offense level determined under Chapter Two and Three by 2 levels."  Mr. Dawydiak meets the criteria for this two-level decrease. He has no criminal history points and did not use threats of violence; the offense did not result in death or injury, is not a sex offense, did not cause "substantial financial hardship" (as defined at § 2B1.1, note 4(F)), did not involve weapons or a violation of individual rights under U.S.S.G. § 2H1.1; and Mr. Dawydiak did not receive any upward adjustments under

13
**Defendant's Sentencing Memorandum**
*United States v. Dawydiak*, No. CR. 22-00457-SI

Chapter 3 of the Guidelines. Thus, if Mr. Dawydiak were sentenced after November 1, 2023, the resulting offense level for the same exact conduct would decrease from 20 to 18, and the advisory Guideline range would decrease from 33 to 41 months to 27 to 33 months. In addition, the commentary to § 4C1.1 explicitly contemplates that a below-Guidelines sentence may be appropriate for a defendant who receives a Zero-Point Offender reduction. *Id*. at Amended U.S.S.G. § 4C1.1, n. 10 (discussing departures).

The agreed-upon sentence of six months' imprisonment and six months' home confinement accounts for the Sentencing Commission's instruction that courts should consider shorter terms of incarceration for "Zero-Point Offenders" such as Mr. Dawydiak.

## IV.   CONCLUSION

For the foregoing reasons, the defense respectfully requests that this Court sentence Mr. Dawydiak to six months' imprisonment to be followed by three years of supervised release, a condition of which is six months of home confinement.

Dated: August 11, 2023                    Respectfully submitted,

                                          SWANSON & McNAMARA LLP


                                          */s/ Ed Swanson*
                                          ED SWANSON
                                          BRITT EVANGELIST
                                          Attorneys for Walter Dawydiak